**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Karla Kretsch, et al., | No. CV-21-02189-PHX-DWL |
| Petitioners, | **ORDER** |
| v. | |
| Guy James Newman, | |
| Respondent. | |

Pending before the Court are Petitioner Karla Kretsch's ("Kretsch") petition for confirmation of arbitration award (Doc. 1) and Respondent Guy James Newman's ("Newman") motion to vacate arbitration award (Doc. 15).  For the following reasons, Kretsch's petition is granted and Newman's motion is denied.

## RELEVANT BACKGROUND

In or around 2009, Newman registered with the Financial Industry Regulatory Authority ("FINRA").  (Doc. 26 at 2.)

Between November 23, 2009 and March 23, 2011, Newman worked as a securities salesperson for GVC Capital, LLC ("GVC"), a broker-dealer also registered with FINRA.  (Doc. 15-1 at 3; Doc. 20-2 at 3.)  Kretsch was one of the GVC customers with whom Newman interacted.

On March 1, 2011, while Newman was still working for GVC, Kretsch signed an account application in which she agreed to be bound by the terms of GVC's customer agreement.  (Doc. 17-1 at 3.)  The customer agreement included an arbitration agreement

that provided, in relevant part, as follows:

> ANY AND ALL CONTROVERSIES, DISPUTES OR CLAIMS BETWEEN YOU AND [GVC], OR THE INTRODUCING BROKER, AGENTS, REPRESENTATIVES, EMPLOYEES, DIRECTORS, OFFICERS OR CONTROL PERSONS OF [GVC] OR THE INTRODUCING BROKER, ARISING OUT OF, IN CONNECTION WITH, FROM OR WITH RESPECT TO (a) ANY PROVISIONS OF OR THE VALIDITY OF THIS CUSTOMER AGREEMENT OR ANY RELATED AGREEMENTS, (b) THE RELATIONSHIP OF THE PARTIES HERETO, OR (c) ANY CONTROVERSY ARISING OUT OF [GVC's] BUSINESS, THE INTRODUCING BROKER'S BUSINESS OR YOUR ACCOUNTS, SHALL BE CONDUCTED PURSUANT TO THE CODE OF ARBITRATION PROCEDURE OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

(*Id.* at 12-13.)

During Newman's tenure with GVC, he recommended three investments that Kretsch purchased. (Doc. 15-1 at 3; Doc. 20-1 at 5-6.)

After Newman left GVC in March 2011, he began working for non-FINRA companies as an unlicensed consultant. (Doc. 15-1 at 7.) Meanwhile, Kretsch maintained her brokerage account with GVC and continued to communicate with Newman. (Doc. 20-1 at 6-7.) Between May 2011 and March 2012, Newman recommended five more investments that Kretsch purchased. (Doc. 15-1 at 3; Doc. 20-1 at 6-7.)

According to Kretsch, after making these investments, she periodically sought updates from Newman and "expressed concern about not getting any of her money back." (Doc. 20-1 at 8.) In response, Newman allegedly "repeatedly told [Kretsch] to 'stay the course' and that if anything happened [he] would 'make her whole' . . . [while] fully aware of the fact that [Kretsch] had learned that the reason she was not feeling well is that she had a life-threatening autoimmune condition that required expensive chemotherapy treatments." (*Id.*) Eventually, Kretsch and Newman entered into a tolling agreement under which they agreed that any claims by Kretsch would be deemed filed as of July 18, 2019. (Doc. 15-1 at 7.)

On June 12, 2020, Kretsch filed a Statement of Claim against Newman and GVC

requesting arbitration before a FINRA arbitration panel (the "Panel"). (Doc. 20-1.) In the statement, Kretsch asserted claims for securities fraud, negligence, breach of fiduciary duty, breach of trust, breach of agency, negligent supervision, control person liability, constructive fraud, negligent misrepresentation, violations of the Arizona Investment Management Act, and breach of contract. (*Id.* at 11-19.) Acknowledging the time lapse between the eight investments at issue and the filing of the Statement of Claim, Kretsch alleged that Newman and GVC "provided false assurances to [her] to conceal their wrongdoing with the intended strategy to ultimately run the clock out on her." (*Id.* at 8-9.)

On September 25, 2020, GVC filed a motion to dismiss, arguing, in part, that Kretsch's claims were subject to a six-year limitations period under FINRA Rule 12206 and therefore time-barred. (Doc. 20-2.) The lengthy motion included an extensive discussion of cases offered to support GVC's position. (*Id.* at 2-18.)

On October 15, 2020, Newman filed a separate motion to dismiss. (Doc. 20-3 at 4-10.) He, too, argued that all of Kretsch's claims were time-barred (because they were based on purchases made more than six years before the July 18, 2019 date specified in the tolling agreement) and provided legal citations in support of his position. (*Id.*) Additionally, Newman separately asserted that "only three of the eight transactions described in the Statement of Claim transpired while Respondent Newman was an associated person and, therefore, only those three transactions are eligible for FINRA arbitration as to Respondent Newman. If this motion is not granted and the matter proceeds to a hearing, Respondent Newman affirms that he does not consent to FINRA arbitration or jurisdiction with respect to the [five] transactions that occurred after March 2011, which is when he severed his registration with Respondent GVC Capital and became unlicensed." (*Id.* at 6.)

On October 29, 2020, Kretsch filed a response to GVC's motion to dismiss. (Doc. 1 at 7.) Later, on November 16, 2020, Kretsch filed a response to Newman's motion to dismiss. (Doc. 15-2 at 2-15.) As for the timeliness issue, Kretsch argued that "FINRA guidance, case law, and . . . principles of equity are clear that the six-year rule (Rule 12206) is not triggered by purchase dates and is not an automatic bar." (*Id.* at 3.) Kretsch then

identified an array of authorities, including the decision in *Mid-Ohio Securities v. Estate of Burns*, 790 F. Supp. 2d 1263 (D. Nev. 2011), that purportedly supported her position.  (*Id.* at 3-11.)  Kretsch also identified reasons why the cited authorities in Newman's brief should be considered inapposite.  (*Id.* at 11-13.)  Finally, as for the separate issue of whether Newman could be required to arbitrate her claims arising from all eight transactions (versus only the claims arising from the three transactions that occurred while Newman was still employed by GVC), Kretsch identified various reasons why Newman should be required to arbitrate everything, including that Newman "consented to jurisdiction such that he has now waived his argument" by participating "in all aspects of this dispute," including a pre-hearing conference.  (*Id.* at 13-14.)

On November 25, 2020, Newman filed a reply in support of his motion to dismiss.  (Doc. 16-1 at 2-10.)  The reply focused almost exclusively on the merits of the timeliness issue under Rule 12206.  (*Id.* at 2-9.)  In the final paragraph before the conclusion, Newman added: "Respondent Newman has not consented to FINRA arbitration or jurisdiction with respect to any transactions that occurred after he severed his registration with Respondent GVC Capital and became unlicensed."  (*Id.* at 9.)

On November 9 and 30, 2020, respectively, the Panel heard oral argument on GVC's and Newman's motions to dismiss.  (Doc. 1 at 7.)  The Panel ultimately denied both motions.  (*Id.*)

On March 8, 2021, GVC filed a motion asking FINRA's Arbitration Director to remove all three members of the Panel.  (Doc. 20-6 at 2-11.)  Among other things, GVC took issue with the Panel's failure to "explain the basis/rationale for" its order denying GVC's motion to dismiss, argued that "the facts and law are so clear that dismissal was required by FINRA rule," and stated that these circumstances suggested the Panel must be biased or lack impartiality.  (*Id.* at 3-6.)

On March 31, 2021, FINRA's Arbitration Director denied GVC's removal application.  (Doc. 20-7.)

On October 13, 2021, Kretsch filed a notice of settlement with GVC, which was

thereafter dismissed from the arbitration proceeding.  (Doc. 1 at 7.)

On December 5, 2021, the Panel issued its award, ordering Newman to pay Kretsch $67,572 in compensatory damages.  (*Id.*)  The Panel also found that even though "Newman did not file a properly executed Submission Agreement" with respect to the arbitration proceeding, he was "required to submit to the arbitration pursuant to the Code . . . and, having answered the claim, appeared, and testified at the hearing, is bound by the determination of the Panel on all issues submitted."  (*Id.*)

On December 21, 2021, Kretsch filed the pending petition for confirmation of the arbitration award.  (Doc. 1.)

On February 23, 2022, Newman filed the pending motion to vacate.  (Doc. 15.)

On March 7, 2022, Kretsch filed a response to the motion to vacate.  (Doc. 20.)

On March 14, 2022, Newman filed a reply.  (Doc. 21.)

On August 4, 2022, the Court issued a tentative ruling.  (Doc. 23.)

On August 18, 2022, the Court heard oral argument.  (Doc. 24.)  At the conclusion of oral argument, the Court solicited supplemental briefing from the parties concerning whether Newman was required to arbitrate all of Kretsch's claims.  (*Id.*)

On September 1, 2022, the parties filed their supplemental briefs.  (Docs. 25, 26.)

## DISCUSSION

I.   Legal Standard

The parties agree that the Federal Arbitration Act ("FAA") supplies the relevant standards for deciding whether the arbitration award should be confirmed or vacated.

Under § 9 of the FAA, a confirmation application "must" be granted "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9.  *See also Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009).  Section 10(a), in turn, identifies four grounds on which an award may be vacated: (1) "where the award was procured by corruption, fraud, or undue means"; (2) "where there was evident partiality or corruption in the arbitrators, or either of them"; (3) "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or

in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced"; or (4) "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a). Meanwhile, § 11 identifies three grounds on which an award may be modified or corrected: (1) "[w]here there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award"; (2) "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted"; or (3) "[w]here the award is imperfect in matter of form not affecting the merits of the controversy."  *Id.* § 11.  Here, the sole provision on which Newman relies is § 10(a)(4)—he argues the award must be vacated because "the arbitrators exceeded their powers . . . by entering an award on claims that i) were time-barred by the tribunal's own statute of repose and ii) were outside the scope of the agreement to arbitrate."  (Doc. 15 at 1.)

As the Ninth Circuit has explained, arbitrators "exceed their powers" for purposes of § 10(a)(4) only "when they express a 'manifest disregard of law,' or when they issue an award that is 'completely irrational.'  For an arbitrator's award to be in manifest disregard of the law, it must be clear from the record that the arbitrator recognized the applicable law and then ignored it."  *Bosack*, 586 F.3d at 1104 (cleaned up).  "Moreover, to rise to the level of manifest disregard the governing law alleged to have been ignored by the arbitrators must be *well defined, explicit, and clearly applicable*."  *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879-80 (9th Cir. 2007) (cleaned up).  Newman bears the burden of establishing that vacatur is proper.  *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

As these standards make clear, "[n]either erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the statute."  *Bosack*, 586 F.3d at 1102 (citations and internal quotation marks omitted).  A court's "review of an underlying arbitration decision . . . is both limited and highly

1    deferential." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1132 (9th Cir. 2003)

2    (citations omitted).  Thus, it "is not enough . . . to show that the panel committed an error—

3    or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671

4    (2010).  A panel's award demands deference because "[b]road judicial review of arbitration

5    decisions could well jeopardize the very benefits of arbitration, rendering informal

6    arbitration merely a prelude to a more cumbersome and time-consuming judicial review

7    process." *Kyocera Corp. v. Prudential-Bache Trade Servs.*, 341 F.3d 987, 998 (9th Cir.

8    2003) (en banc).

9    II.    Merits

10          Newman argues that the arbitrators exceeded their powers by entering an award on

11   claims that were (1) time-barred by FINRA's six-year eligibility rule and (2) partially

12   outside the scope of the agreement to arbitrate.  (Doc. 15 at 1.)

13          A.    **Eligibility & FINRA Rule 12206(a)**

14                1.    The Parties' Arguments

15          Newman argues that he provided the Panel with citations to previous FINRA

16   arbitration awards in which arbitrators interpreted the phrase "occurrence or event" in

17   FINRA Rule 12206(a) to be the event that *created* the cause of action, in each case, the

18   *purchase* of the investments.  (*Id.* at 4-6.)  Thus, Newman contends that because Kretsch

19   made all eight purchases between June 2010 and March 2012, all of her claims fell outside

20   the six-year window (based on the June 2019 tolling date).  (*Id.*)  Newman also argues that

21   Rule 12206 does not allow for stopping the clock until a reasonable investor is on notice

22   of the claim.  (*Id.* at 6.)

23          Kretsch responds that the Panel did not exceed its powers with respect to the six-

24   year eligibility rule because it was empowered, under *Howsam v. Dean Witter Reynolds*,

25   537 U.S. 79 (2002), to resolve any questions about the eligibility of a claim; because

26   FINRA's Director denied GVC's interlocutory appeal of the Panel's eligibility

27   determination, thereby "indicating that allowing [Kretsch's] claims to proceed was not an

28   abuse of the arbitrators' discretion"; and because the Panel correctly determined under

1    *Mid-Ohio Securities v. Estate of Burns*, 790 F. Supp. 2d 1263 (D. Nev. 2011), that the six-

2    year eligibility rule did not begin to run at the date of purchase, but rather was "tolled by

3    Newman's ongoing fraud and false assurances." (Doc. 20 at 5-8.)

4        In reply, Newman argues that a majority of courts have held that Rule 12206 is an

5    absolute bar to claims submitted for arbitration more than six years after the event which

6    gave rise to the dispute (here, the purchase of the investments), that the eligibility rule "is

7    not subject to equitable tolling due to allegations of fraudulent concealment," and that *Mid-*

8    *Ohio Securities* is a wrongly-decided outlier. (Doc. 21 at 2-3.) Newman also argues that

9    "Rule 12206(c) and (d) contemplate tolling for specific, limited purposes not relevant here,

10   but such language is conspicuously absent from Rule 12206(a)," and that when the Panel

11   was considering the pleadings, "there was no evidence of continuing fraud that constituted

12   a continuing occurrence as now alleged." (*Id.* at 3-4.)

13                    2.    Analysis

14       Newman has failed to meet his burden of establishing that the arbitrators "exceeded

15   their powers," as that term is construed under § 10(a)(4) of the FAA, by rejecting his

16   argument that Kretsch's claims were time-barred under FINRA Rule 12206(a).[1]  As noted,

17   arbitrators only exceed their powers when they express a "manifest disregard for the

18   law"—which in turns requires a showing that the governing law was well defined, explicit,

19   and clearly applicable and that the arbitrators recognized the governing law yet ignored

20   it—or when they issue an award that is "clearly irrational." *Bosack*, 586 F.3d at 1104;

21   *Collins*, 505 F.3d at 879-80. Serious legal errors are not enough to establish manifest

22   disregard or clear irrationality. *Stolt-Nielsen S.A.*, 559 U.S. at 671.

23       In *Mid-Ohio Securities Corporation v. Estate of Burns*, 790 F. Supp. 2d. 1263 (D.

24   Nev. 2011), the court addressed a nearly identical question. There, a customer of a broker-

25   dealer made an investment of over $300,000 in March 2002. *Id.* at 1265. The investment

26

27   ───────────────────────────

     [1]    That rule provides: "No claim shall be eligible for submission to arbitration under
28   the Code where six years have elapsed from the occurrence or event giving rise to the
     claim. The panel will resolve any questions regarding the eligibility of a claim under this
     rule." *See* https://www.finra.org/rules-guidance/rulebooks/finra-rules/12206.

eventually proved worthless. *Id.* In September 2009, over seven years after the investment date, the now-deceased customer's estate filed a statement of claim with FINRA related to the investment, arguing that the broker-dealer acted negligently by failing to perform due diligence. *Id.* During the arbitration process, the broker-dealer argued the claims were time-barred because they "were brought more than six years from the date the securities were purchased," but the panel "denied the motion to dismiss without comment" and eventually issued a $280,683.50 award in the estate's favor. *Id.* at 1265-67. In the ensuing confirmation proceeding in federal court, the broker-dealer moved to vacate on the ground that "the panel manifestly disregarded the law because it allowed the claims to proceed even though they were ineligible for arbitration under FINRA Rule 12206." *Id.* at 1269. The district court rejected this argument and confirmed the award. Although the court acknowledged that some cases supported the broker-dealer's proffered interpretation of Rule 12206, it also noted that other cases seemed to support the arbitrators' interpretation. *Id.* at 1270-71. Given this backdrop, the court concluded that "[t]he arbitrators did not manifestly disregard the law for several reasons," including that "Mid-Ohio has not established that the law it alleges the panel ignored was well defined, explicit, and clearly applicable." *Id.* at 1271-72.

The Court finds this analysis persuasive. The question here isn't whether the Panel's timeliness analysis regarding Rule 12206 was *correct*. This is a proceeding to confirm an arbitration award, not an appeal. Thus, Newman may obtain vacatur under § 10(a)(4) only by establishing that the law governing the timeliness inquiry was well-defined and explicit, the Panel was aware of this settled law, and the Panel nevertheless decided to ignore it. Newman has not made such a showing here. During the underlying proceeding, both sides filed detailed briefs on the timeliness issue filled with cases and authorities they viewed as supporting their respective positions. True, Newman's brief identified several previous FINRA decisions adopting his preferred interpretation of Rule 12206, but Newman does not cite (and the Court cannot find) a Ninth Circuit case holding that previous FINRA awards are binding on future panels. The Panel ultimately agreed

with Kretsch's proposed interpretation, and Newman has not presented any evidence that the Panel "ignored" the law in reaching this decision.  It is also notable that, after GVC complained about the denial of its dismissal motion and argued that the rejection of its timeliness arguments could only have been motivated by bias or other improper considerations, FINRA's Arbitration Director denied GVC's application to remove the Panel members.  (Docs. 20-6, 20-7.)  This, too, undermines any suggestion that the Panel's ruling on the timeliness issue exhibited a manifest disregard for the law.

At any rate, as the court in *Mid-Ohio* recognized, there are reasonable grounds for disagreement about whether Rule 12206(a) is subject to tolling and whether the relevant event or occurrence from which the time period begins to run is the purchase of the securities.  The parties do not cite, and the Court cannot find, any subsequent Ninth Circuit case expressly holding that Rule 12206 is *not* subject to tolling and/or that the triggering event must be the purchase of the securities.  Thus, Newman's dissatisfaction with the Panel's ruling on these issues cannot provide the basis for vacatur under § 10(a)(4).  *See, e.g.*, *Huitt v. Wilbanks Sec., Inc.*, 2017 WL 4697502, *5 (D. Colo. 2017) ("[B]ecause it was for the Panel and not this Court to decide whether Plaintiff's claims fell within Rule 12206(a)'s six-year timeframe, the Court rejects Defendant's invitation to second-guess the Panel's interpretation of FINRA Rule 12206(a)."); *Oshidary v. Purpura-Andriola*, 2012 WL 2135375, *5 (N.D. Cal. 2012) (collecting cases, agreeing with *Mid-Ohio*'s analysis, and holding "[t]he Panel was free to interpret Rule 12206 as it saw fit, in particular with respect to the triggering date, i.e., the 'occurrence or event giving rise to the claim'," particularly because there was no "well defined, explicit, and clearly applicable" law regarding whether the triggering date must be the date of investment).  *See also Cristo v. Charles Schwab Corp.*, 2021 WL 6051825, *6 (S.D. Cal. 2021) ("The Court recognizes Plaintiff's dissatisfaction with the panel's eligibility rulings; however, the Court may not second-guess the panel's interpretation of FINRA Rule 12206(a), even if erroneous. . . . Therefore, Plaintiff's numerous arguments concerning the Panel's ruling . . . on the eligibility of his claim under FINRA Rule 12206(a) are not subject to vacatur.").

1       B.      **Arbitrability**

2               1.      The Parties' Arguments

3       Newman's final argument is that "the arbitrators exceeded their powers by

4 considering claims outside the scope of the agreement to arbitrate."  (Doc. 15 at 6,

5 capitalization omitted.)  Newman elaborates that "a party cannot be required to submit to

6 arbitration any dispute which that party has not agreed to submit" in contract.  (*Id.* at 6-9.)

7 Newman contends that because five of the transactions at issue here occurred between May

8 2011 and March 2012, which is after he left GVC and was no longer licensed under FINRA,

9 it follows that he could not be required to arbitrate Kretsch's claims arising from those

10 transactions.  (*Id.*)  In the alternative to vacating the entire award, Newman asks the Court

11 to remand the case for determination of only the three claims arising while he was a

12 registered FINRA salesperson with GVC.  (*Id.* at 9.)

13      Kretsch responds that the Panel did not exceed its powers because "consent to grant

14 the arbitrator such authority may be implied from the conduct of the parties in the

15 arbitration setting" and here, "Newman submitted to the arbitration by actively

16 participating in every step of the arbitration.  Newman filed an answer and a motion to

17 dismiss, participated in the selection of and agreed to the composition of the panel, and

18 actively participated and was engaged in the two-day evidentiary hearing of this matter."

19 (Doc. 20 at 1-2, 9-10.)  Kretsch assigns particular significance to the fact that Newman did

20 not limit himself to making an arbitrability challenge in his motion to dismiss but also

21 argued, in the alternative, that he should prevail on the merits.  (*Id.* at 9.)  Kretsch contends

22 that, under Ninth Circuit law, this means that Newman "consented to allow the arbitration

23 to decide the entire controversy."  (*Id.*)

24      In reply, Newman acknowledges that there was an express arbitration agreement in

25 effect for the first three transactions but argues that after he left GVC and was no longer

26 licensed with FINRA, there were no express agreements in place.  (Doc. 21 at 4-5.)

27 Newman also contends that his participation in the November 2021 hearing cannot be

28 viewed as consent to be bound because he had previously raised an express objection based

on arbitrability.  (*Id.* at 5.)

During oral argument, the Court solicited supplemental briefing from the parties on the arbitrability question.  (Doc. 24.)  In her brief, Kretsch identifies two grounds for affirming the Panel's finding of arbitrability.  First, Kretsch argues that Newman was required to arbitrate all of her claims under FINRA Rule 12200 because the FINRA Code defines the term "person associated with a member" to include "person formerly associated with a member," and thus Newman's departure from GVC in 2011 didn't interfere with the arbitrability of claims arising in connection with his activities at GVC.  (Doc. 25.) Second, Kretsch argues that Newman was also required to arbitrate all of her claims pursuant to the arbitration clause in her GVC customer agreement, even though he did not sign that agreement, because (a) he previously conceded that he was bound by this clause; and (b) even without this concession, he would be bound pursuant to the doctrines of direct benefits estoppel and/or equitable estoppel.  (*Id.*)

In his brief, Newman argues that he cannot be compelled to arbitrate based on Kretsch's customer agreement with GVC or the FINRA arbitration submission agreement because he never signed either document.  (Doc. 26 at 2.)  In contrast, Newman acknowledges that "[w]hen [he] registered with FINRA in 2009, he agreed, like all other members, to comply with FINRA's rules such as Rule 12200."  (*Id.*)  Nevertheless, Newman argues that FINRA Rule 12200 doesn't require arbitration with respect to the five claims that arose after he left GVC because (1) they "occurred <u>after</u> [he] was no longer registered with FINRA and, therefore, that dispute is not between a customer and a regulated associated person of a member"; and (2) "the FIVE Claims do not arise from the business activities of the member (GVC) or the associated person."  (*Id.* at 3.)

## 2. <u>Analysis</u>

An arbitrability challenge is a potentially valid basis for seeking vacatur of an arbitration award.  *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995) ("When arbitrators rule on a matter not submitted to them, or act outside the scope of the parties' contractual agreement, the award may be overturned because the arbitrators

exceeded the scope of their authority."). After all, "[a]rbitration is strictly a matter of consent." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks omitted). Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). "While ambiguities in the language of [an] agreement should be resolved in favor of arbitration, [courts] do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House*, 534 U.S. 279, 294 (2002) (citation omitted).

One issue raised by Newman's challenge is whether he implicitly authorized the Panel to decide the question of arbitrability. The Court begins by addressing this issue because its resolution helps define the resulting standard of review.

Parties may authorize an arbitrator, rather than a court, to resolve threshold arbitrability questions. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). The Ninth Circuit has held that such an agreement may be implied by the parties' conduct. In *George Day Construction Company, Inc. v. United Brotherhood of Carpenters & Joiners of America, Local 354*, 722 F.2d 1471 (9th Cir. 1984), an employer sought to vacate an arbitration award, "assert[ing] that because the dispute arose after the expiration of the collective bargaining agreement[,] the duty to arbitrate terminated with the agreement" and the arbitrator accordingly lacked authority to enter the award. *Id.* at 1474. During the arbitration, the employer contested both the arbitrator's authority and the merits of the dispute. *Id.* The Ninth Circuit affirmed. As an initial matter, the court held that the employer's conduct during the arbitration proceeding amounted to implicit consent to allow the arbitrator to decide the threshold question of arbitrability:

> The merits of the dispute along with the question of jurisdiction were fully addressed by the parties during the arbitration proceeding and, at its conclusion, the entire controversy was submitted to the arbitrator for decision. Nowhere in the record is there any indication that the employer reserved the question of arbitrability for initial determination in a judicial forum. Under these circumstances, we conclude that the employer impliedly

consented to the arbitrator's deciding both the question of arbitrability and
the merits of the controversy.

*Id.* at 1475.  The court also identified various ways in which the employer could have
avoided providing such implicit consent.  *Id.* at 1475-76 (explaining that "the arbitrability
question would have been preserved for independent judicial scrutiny" if the employer had
"voice[d] its objection on the arbitrability issue and state[d] on the record that it was
reserving that question for later judicial determination" or "taken the initiative by seeking
declaratory and injunctive relief prior to the commencement of arbitration").  Finally, given
the determination that "the employer initially submitted the arbitrability question to the
arbitrator," the court held that "any subsequent judicial review [of the arbitrability
question] was narrowly circumscribed" and that the court was "not at liberty to substitute
our own view [on the arbitrability question] in place of the arbitrator's regardless what our
view might be of the correctness of the arbitral decision."  *Id.* at 1476.  More specifically,
the court held that it could only review the arbitrator's arbitrability determination under a
"deferential" and "narrow standard" that required affirmance "notwithstanding the
erroneousness of any factual findings or legal conclusions, absent a manifest disregard of
the law."  *Id.* at 1477.  Applying these standards, the court held that "even assuming,
*arguendo*, that the arbitrator misinterpreted" the precedents bearing on the merits of the
arbitrability question, "we must defer to this interpretation.  By consenting to the
arbitrator's consideration of the arbitrability question, the parties bound themselves to his
decision.  They are bound even if the award resulted from a misinterpretation of law, faulty
legal reasoning or erroneous legal conclusion."  *Id.* at 1479.

Kretsch argues that *George Day* compels a finding that Newman implicitly
authorized the Panel to decide the question of arbitrability.  Recognizing that the issue
presents a somewhat close call, the Court disagrees.  In his motion to dismiss filed at the
outset of the arbitration proceeding, Newman only argued that dismissal was warranted
due to untimeliness under Rule 12206(a).  (Doc. 20-3 at 4-10.)  Although the motion also
included a section explaining why Newman believed that some of Kretsch's claims fell

outside the scope of the arbitration agreement, Newman didn't ask the Panel to make a ruling on the arbitrability issue or to partially dismiss Kretsch's claims based on this alternative ground—instead, Newman simply clarified that "he does not consent to FINRA arbitration or jurisdiction with respect to the . . . transactions that occurred after March 2011." (*Id.* at 9-10.) Similarly, in his reply brief, Newman sought dismissal based solely on the untimeliness issue and made clear that he "has not consented to FINRA arbitration or jurisdiction with respect to any transactions that occurred after he severed his registration with Respondent GVC Capital and became unlicensed." (Doc. 16-1 at 9.)

Given this backdrop, there is no merit to Kretsch's contention that "Newman made clear at the arbitration that he was hoping the panel would disregard certain claims because of issues of arbitrability." (Doc. 20 at 10.) The discussion of arbitrability in Newman's motion-to-dismiss briefing is best viewed as an objection to the Panel's authority due to a lack of arbitrability, not an invitation for the Panel to decide the question of arbitrability. This is much different from *George Day*, where the employer "evinced clearly its intent to allow the arbitrator to decide not only the merits of the dispute but also the question of arbitrability" and never provided "any indication that [it] reserved the question of arbitrability for initial determination in a judicial forum." 722 F.2d at 1475. Although the Panel included a ruling as to arbitrability in its final decision (Doc. 1 at 7 ["Newman . . . is required to submit to arbitration pursuant to the Code of Arbitration Procedure . . . and, having answered the claim, appeared, and testified at the hearing, is bound by the determination of the Panel on all issues submitted."]), the Court does not see how the presence of this ruling could serve as proof of Newman's implicit consent to allow the Panel to decide the issue. As noted, Newman never asked the Panel to decide the question of arbitrability in his motion-to-dismiss briefing. And because the transcript of the final hearing is not in the record, there is no evidence that Newman subsequently made an oral request for the Panel to decide the issue.

Courts confronting similar conduct have declined to find implicit consent to allow the arbitrator to decide the question of arbitrability. In *Coast Hotels & Casinos, Inc. v.*

*Culinary Workers Union Local 226*, 35 F. Supp. 2d 765 (D. Nev. 1999), although a party submitted the merits of the grievance to arbitration, it "specifically objected to the arbitrability issue, and only submitted the merits subject to its objection." *Id.* at 769. The court thus determined that the objecting party "did all that was necessary to preserve for judicial determination the issue of whether the arbitrator had jurisdiction to decide the . . . grievance." *Id.* Similarly, in *Van Waters & Rogers v. Local Union 70*, 913 F.2d 736 (9th Cir. 1990), the court found that Van Waters "carefully preserved its objections to arbitrability, as required by *George Day*," by stating that it was "only wiling to grant the Arbitrator has jurisdiction, over [certain] grievances filed . . . [and] the Arbitrator has no jurisdiction and [we] are [not] willing to concede jurisdiction over [other grievances]. The Arbitrator, may, accordingly, make no ruling affecting that facility, that contract, or that [party].'" *Id.* at 740. And again, in *Jacob v. First Collateral Services, Inc.*, 2008 WL 11338811 (D. Ariz. 2008), the court found that Jacob preserved the arbitrability determination for the court, even though he "was involved in selection of the Arbitrator; . . . appeared at the January 23, 2007 telephonic hearing before the Arbitrator; and . . . filed a motion with the Arbitrator," because he "still forcefully objected on several occasions to the jurisdiction of AAA over the dispute . . . [and] unequivocally reserved the right to challenge the jurisdiction of the arbitrator." *Id.* at *5-6. Although Newman's reservations in this case may not have been quite as clear as the reservations in the above-cited cases— he never explicitly stated that he objected to a Panel ruling on the issue of arbitrability— he still did enough to "reserve[] the question of arbitrability for initial determination in a judicial forum." *George Day,* 722 F.2d at 1475.

This determination does not, however, mean the arbitration award must be vacated. Instead, it simply means the Court need not defer to the Panel's finding of arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("If, on the other hand, the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently."). And having independently

considered the issue, the Court concludes that Kretsch's claims arising from the five post-March 2011 transactions were subject to arbitration.

### a.  **FINRA Rule 12200**

As noted, the Panel found that Newman was "required to submit to arbitration pursuant to the Code of Arbitration Procedure."  (Doc. 1 at 7.)  It appears this was a reference to Rule 12200 of the FINRA Code.

Newman acknowledges that he agreed to be bound by Rule 12200 when he registered with FINRA in 2009.  (Doc. 21 at 4; Doc. 26 at 2.)  Thus, it is undisputed that a written agreement to arbitrate *existed* in this matter—the only dispute is whether all of Kretsch's claims fell within the *scope* of that agreement.  *See generally Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 739 n.1 (9th Cir. 2014) ("FINRA Rule 12200 constitutes an 'agreement in writing' under the FAA, and, assuming Reno is a customer, it is entitled to invoke FINRA Rule 12200 as an intended third-party beneficiary in its dispute with Goldman."); *Pictet Overseas Inc. v. Helvetia Trust*, 905 F.3d 1183, 1187 (11th Cir. 2018) ("Despite the absence of a direct, written agreement, an agreement to arbitrate still may be found based on Pictet Overseas's membership in FINRA. . . .  When Pictet Overseas joined FINRA, it agreed, like all other FINRA members, to comply with FINRA's rules.  These rules include FINRA Rule 12200, which requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand.  Pictet Overseas's agreement when joining FINRA thus may 'itself constitute[] the agreement' to arbitrate.") (citations omitted).

Turning to the question of scope, Rule 12200 provides as follows:

Parties must arbitrate a dispute under the Code if:

- Arbitration under the Code is either:
    - (1)  Required by a written agreement, or
    - (2)  Requested by the customer;
- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of

> the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

*See* https://www.finra.org/rules-guidance/rulebooks/finra-rules/12200.  Thus, questions of arbitrability under Rule 12200 are "determined by analyzing the three elements enumerated in the Rule.  First, [whether] arbitration is requested by the customer . . . .  Second, [whether] the dispute is between [a] customer[] and associated persons of a member. . . . Third, [whether] the dispute arises in connection with the business activities of the member or associated persons."  *Hull v. Bennett*, 2015 WL 1143857, *4 (C.D. Cal. 2015) (citations omitted).

The first element ("Requested by the customer") was satisfied here because arbitration was requested by Kretsch, who easily qualified as a "customer."  *Goldman, Sachs*, 747 F.3d at 41 (for purposes of Rule 12200, "a 'customer' is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities").

As for the second element ("The dispute is between a customer and a member or associated person of a member"), Newman emphasizes that some of Kretsch's claims arose from the five purchases that occurred after he left GVA and "was no longer registered with FINRA."  (Doc. 26 at 3.)  This may be true, but Newman overlooks how the FINRA Code defines the term "Person Associated with a Member":

> The term "person associated with a member" means:
>
> (1)  A natural person who is registered or has applied for registration under the Rules of FINRA; or
>
> (2)  A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not:

(A)   Any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA; or

(B)   Any such person's registration is revoked, cancelled, or suspended, the person has been expelled or barred from FINRA, or the person's registration has been terminated for a minimum of 365 days.

**For purposes of the Code, a person formerly associated with a member is a person associated with a member**.

*See* FINRA Rule 12100(w) (emphasis added), *available at* https://www.finra.org/rules-guidance/rulebooks/finra-rules/12100.   As the bolded language makes clear, because Newman was "formerly associated" with GVC, which is a FINRA member, he continued to qualify as a "person associated with a member" for purposes of Rule 12200.   *Cf. Raymond James Financial Services, Inc. v. Armijos*, 2020 WL 2026316, *7 (S.D. Fla. 2020) ("[T]he relevant question at this juncture is whether a person formerly associated with a FINRA member can still be deemed an 'associated person' for purposes of triggering arbitration under Rule 12200.   The Court answers this question in the affirmative, and the plain language of the FINRA Code, once again, favors Defendants' interpretation. . . .   It is undisputed that Chatburn was formerly associated with RJFS and initiated his solicitation of Defendants while affiliated.   Because 'formerly associated' means 'associated' under the FINRA Code, Chatburn is an 'associated person' with RJFS for purposes of Defendants' claims.") (citations omitted).

Newman's arguments regarding the third element ("The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company") fail for similar reasons.   Newman asserts that the last five transactions did not arise in connection with the business activities of a member because they "involved the purchase of stock and debt instruments from third parties, and not from a FINRA regulated party such as . . . GVC."   (Doc. 26 at 3.)   However, the third element is not limited to disputes arising in connection with the business activities of "the member"—it also encompasses

- 19 -

disputes arising in connection with the business activities of "the associated person."  And as noted in the preceding paragraph, the FINRA Code broadly defines the term "associated person" to included individuals formerly associated with a member, such as Newman. Here, the last five claims clearly arose in connection with the business activities of Newman, so they are covered.[2]

For these reasons, Newman was properly required under Rule 12200 to arbitrate all of Kretsch's claims.

### b.   **The Arbitration Clause In The Customer Agreement**

The arbitrability analysis in the tentative order issued before oral argument focused on the arbitration clause in Kretsch's customer agreement with GVC, not Rule 12200.  In light of the analysis regarding Rule 12200 set forth above, it is no longer necessary to address that clause's applicability to Newman.

Nevertheless, in an abundance of caution, the Court clarifies that it views the arbitration clause in the customer agreement as providing an alternative basis for confirming the award.  Although Newman contends in his supplemental brief that he was not bound by the arbitration clause in the customer agreement because he never signed it (Doc. 26 at 2), Newman took a different position during the merits briefing process, conceding that "[t]here is no dispute that Petitioner, Respondent Newman and GVC Capital entered into binding arbitration agreement in 2011 . . . ."  (Doc. 15 at 7.)[3]

Kretsch's claims arising from the five post-March 2011 transactions fall within the scope of the arbitration clause in the customer agreement.  It requires arbitration of all "controversies, disputes or claims" between Kretsch and "the introducing broker, agents, representatives, employees, directors, officers or control persons" of GVC "arising out of" or "in connection with" "the relationship of the parties hereto."  (Doc. 17-1 at 12-13.)  Due

---

[2]      There is a strong argument that the final five transactions also arose "in connection with" the business activities of GVC, because they were inextricability intertwined with the first three transactions, but it is unnecessary to resolve that issue for purposes of evaluating Rule 12200's applicability because the final five transactions so clearly arose "in connection with" the business activities of Newman.

[3]      Given this concession, there is no need to address the new arguments in Kretsch's supplemental brief regarding direct benefits estoppel and equitable estoppel.

to the inclusion of the phrases "arising out of" and "in connection with," the clause sweeps broadly. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("Every court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly. We likewise conclude that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract."). Accordingly, although the five post-March 2011 transactions may have occurred after Newman stopped being employed by GVC, those transactions still "ar[ose] out of" or "in connection with" the "relationship" between Kretsch and Newman (as well as the "relationship" between Kretsch and GVC) because they flowed from the relationship that was formed while Newman was employed by GVC. Indeed, Kretsch asserted during the arbitration proceeding that she was under the misimpression that Newman "was still associated with . . . GVC" at the time he solicited the five post-March 2011 transactions. (Doc. 20-1 at 6.) Additionally, one of the post-March 2011 transactions was clearly related to a pre-March 2011 transaction because it involved the same underlying company. (Doc. 16-1 at 8 [two of the challenged transactions were a $25,000 investment in October 2010 in "KBC Bricks Common Stock" and a $30,000 investment in May 2011 in "KBC Bricks Loan"].)

There is ample authority supporting a finding of arbitrability under these circumstances. In *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243 (1977), the Supreme Court held that the obligation to arbitrate can survive the termination of a collective bargaining agreement and that a presumption of arbitrability applies unless negated expressly or by clear implication by the terms of the contract. *Id.* at 255 ("where the dispute is over a provision of the expired agreement," "the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship"). There, the agreement provided that "'any grievance' arising between the parties was subject to binding arbitration," and the Court construed this broad

language as applying to grievances arising after termination of the contract. *Id.* at 245. *See also Litton Fin. Printing Division v. NLRB*, 501 U.S. 190, 204 (1991) (recognizing a "presumption in favor of postexpiration arbitration of matters unless 'negated expressly or by clear implication' . . . [for] matters and disputes arising out of the relation governed by contract") (quoting *Nolde*, 430 U.S. at 255); *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1061 (9th Cir. 2020) (agreeing with other circuits that *Litton* applies in the FAA context).

Courts have construed *Nolde* and its broad presumption of arbitrability of post-expiration grievances as applying to grievances that "involve rights which to some degree have vested or accrued during the life of the contract and merely ripened after termination, or relate to events which have occurred at least in part while the agreement was still in effect." *Chauffeurs, Teamsters & Helpers, Loc. Union 238 v. C.R.S.T., Inc.*, 795 F.2d 1400, 1403 (8th Cir. 1986) (collecting cases); *see also Optimum Prods. v. Home Box Off.*, 839 F. App'x 75, 77 (9th Cir. 2020) ("Every court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly, and we likewise conclude that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract. Thus, to require arbitration, [the party's] factual allegations need only 'touch matters' covered by the contract.") (cleaned up). Here, the claims based on the five post-March 2011 transactions "arose out of" or "in connection with" the "relationship" between Kretsch and Newman that came into effect while the arbitration agreement was still in place. Additionally, the arbitration agreement did not expressly exclude disputes arising after contract termination.

For these reasons, the arbitration clause provides an additional basis for concluding that Newman was properly required to submit to arbitration with respect to all of Kretsch's claims.

…

…

- 22 -

Accordingly,

**IT IS ORDERED** that Kretsch's petition for confirmation (Doc. 1) is **granted** and Newman's motion to vacate (Doc. 15) is **denied**.

**IT IS FURTHER ORDERED** that a separate judgment will issue, after which the Clerk shall terminate this action.

Dated this 6th day of September, 2022.

Dominic W. Lanza
United States District Judge